## HEISKELL *v*. CHESAPEAKE & POTOMAC TELEPHONE COMPANY.

---

TELEPHONE SERVICE; PUBLIC UTILITIES COMMISSION; RATES.

In a suit for a mandatory injunction against a telephone company by a subscriber under a flat-rate contract, by the terms of which he paid

---

Note.—On the general question of right of telephone company to discriminate as to rates, see note in 36 L.R.A.(N.S.) 561.

a stated sum per year for unlimited service, to compel the company
to supply him such service at that rate until the Public Utilities
Commission of the District should hear and determine the question
of rates to be charged by telephone companies, where it appeared
that at the time of the establishment by act of Congress of March
4, 1913 (37 Stat. at L. 974, chap. 150) of the Commission, which act
prohibited discriminatory charges by public utility companies, and
prohibited any such company from exacting greater compensation
for service than at its lowest existing rate unless the Commission
should so order, no flat-rate contracts had been entered into by the
company for nine years, and there remained only a few such con-
tracts outstanding, all other contracts being for measured service,
by the terms of which the subscribers paid for the service actually
furnished them; and that the Commission had determined that such
flat-rate service was unlawful as discriminatory, whereupon the com-
pany had terminated its contract with the plaintiff, offering him
measured service under its regular schedules for such service, and
that the Commission had announced that as a result of a pending
investigation and after public hearing rates for telephone service
would be fixed, it was *held,* affirming a decree dismissing plaintiff's
bill, that the act of Congress in question continued in force, until the
Commission should act, current rates only, and not rates no longer
open to the public, and that the contract with the appellant was
discriminatory in its character and therefore expressly prohibited
by the act.

No. 2870.   Submitted February 10, 1916.   Decided April 24, 1916.

HEARING on an appeal by the plaintiff from a decree of the
Supreme Court of the District of Columbia dismissing a bill
in equity for a mandatory injunction to compel the defendant,
a telephone company, to supply the plaintiff with telephone
service at a rate named in contract between the parties.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

Appeal from a decree in the supreme court of the District
dismissing a bill for a mandatory injunction to compel the
appellee, the Chesapeake & Potomac Telephone Company, to
supply appellant, Jesse L. Heiskell, telephone service at a rate

named in a contract between the parties, "until lawful hearing and determination of said rate question" is had by the Public Utilities Commission. The case was heard upon bill, rule to show cause, answer to the bill, and return to the rule.

Appellee, as its name indicates, is a public service corporation engaged in the telephone business in the District of Columbia. In the year 1883, when its subscribers were relatively few, it established what is known as unlimited "flat-rate" business service, under which the subscriber pays a stated sum per year, without reference to the number of calls made. Contracts for such service contain a provision that either party may terminate them after the first year on ten days' notice. A contract of this sort was entered into on June 29, 1903, with the appellant. In the year 1896 the telephone company also established a schedule of measured or message rates for business service, under which each subscriber pays for the actual service rendered. On June 30, 1904, when there were approximately 8,413 business stations in use in the District, of which 2,730 were on the flat-rate basis, the telephone company ceased entering into further contracts of that sort. In other words, from that time on all new subscribers were required to pay according to the actual service rendered. Through its efforts to eliminate existing flat-rate contracts without friction, the number of these contracts had been reduced, on March 1, 1913, to 188, covering service to 312 stations, whereas on that date there were approximately 6,900 contracts for business service under the measured standard, covering approximately 21,773 stations. It thus appears that on the date last named no flat-rate contracts had been entered into by the company for nine years.

On March 4, 1913, the Public Utilities Commission of the District of Columbia was created by Congress (37 Stat. at L. 974, chap. 150). Paragraph 2 of the act reads in part as follows: "The charge made by any such public utility for any facility or services furnished or rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory. Every unjust or unreasonable or discriminatory charge for such

facility or service is prohibited and is hereby declared unlawful."

Under paragraph 24 it is made the duty of every public utility to file with the Commission "schedules, which shall be open to public inspection, showing all rates, tolls, and charges which it has established and which are in force at the time for any service performed by it within the District of Columbia, or for any service in connection therewith or performed by any public utility controlled or operated by it." This paragraph further provides that "the rates, tolls, and charges shown on such schedules shall not exceed the rates, tolls, and charges now allowed by law, and shall be the lawful rates, tolls, and charges within the District of Columbia, and shall remain and be in force until set aside by the Commission."

Paragraph 30 reads as follows: "That it shall be unlawful for any public utility to charge, demand, collect, or receive a greater or less compensation for any service performed by it within the District of Columbia, or for any service in connection therewith, than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, or to demand, collect, or receive any rate, toll or charge not specified in such schedules. The rates, tolls, and charges named therein shall be the lawful rates, tolls and charges until the same are changed as provided in this section."

Paragraph 81 forbids, under penalty, the charging or collecting of a greater or less compensation for any service rendered "than that prescribed in the public schedules or tariffs then in force or established as provided herein, or than it charges, demands, collects, or receives from any other person, firm or corporation other than one conducting a like business for a like and contemporaneous service."

Paragraph 94 reads in part as follows: "That, first, unless the Commission shall otherwise order, it shall be unlawful for any public utility within the District of Columbia to demand, collect, or receive a greater compensation for any service than the charge fixed on the lowest schedules of rates for the same

service under the law in force at the date of the passage of this section."

The telephone company seasonably filed with the Commission its regular schedule of rates in force on March 4, 1913, and appended thereto a list of rates which it denominated "obsolete" rates.   These so-called obsolete rates embraced the flat-rate contracts for business service, including the contract of appellant. Thereafter, a flat-rate contract subscriber brought to the attention of the Commission that the telephone company desired to cancel the contract, and sought the views of the Commission upon the question whether the continuance in force of the service provided by that contract would cónstitute a discriminatory act, in violation of the Public Utilities law.   Under date of May 4, 1914, the Commission, through its chairman, filed an opinion in which it said:   "The Commission adopts the opinion of its general counsel that the flat-rate business service above referred to is discriminatory in the meaning of the law, and that the continuance in force of this and similar contracts discriminates against new subscribers who are refused similar service by the telephone company, and perpetuates the very inequality which the Public Utilities law was enacted to prevent.   The Commission is therefore of the opinion that the flat-rate business service is unlawful because of such discrimination, and that the telephone company and all persons receiving this class of service under contracts similar to that referred to are subject to the fines prescribed by the Public Utilities law."   A copy of this opinion was sent to the telephone company.   Thereupon, after notice in writing, that company terminated its contract with appellant, offering him measured service under its regular schedules. After receiving a copy of the above opinion of the Commission, appellant, in a communication to the Commission, said:   "Because the telephone company wishes to force its old subscribers having unlimited service to take a measured service and pay a higher rate, you conclude," etc.   In a communication to appellant dated May 18, 1914, the Commission directed attention to the fact that it was then engaged in making such an investiga-

tion of public utilities as would enable it intelligently to fix
rates, and that before such rates were fixed a public hearing
would be held.    The communication continues:    "From this it
will appear that while the immediate effect of cancelling the un-
limited business service in the case of the telephone company
may result in increased rates for those who are enjoying this
class of service, it does not follow that this condition will con-
tinue when rates for telephone service are finally fixed by this
Commission."    Thereupon, on July 15, 1914, this bill was
filed.

In its answer the telephone company averred "that the said
obsolete or flat rate is unfair and discriminatory as against the
great majority of its business subscribers who are and for many
years have been paying the regular standard measured or mes-
sage rates."    The answer admitted that these flat rates were the
lowest rates in existence prior to March 1, 1913, but denied that
under the law said flat rate was the lawful, nondiscriminatory
rate, and averred that said rate "was the favored and discrimi-
natory rate at the time of the passage of said act of March 4,
1913, and by the express terms of said act made unlawful by
reason of such discrimination."

*Mr. E. H. Thomas* and *Mr. Wm. G. Johnson,* for the appel-
lant, in their brief cited:

*Armour Packing Co.* v. *United States,* 209 U. S. 56, 81; *B. &
O. R. Co.* v. *Pitcairn Coal Co.* 215 U. S. 481; *Bourke* v. *Olcott
Water Co.* 33 L.R.A.(N.S.) 1015; *Chesapeake & P. Tel. Co.*
v. *Manning,* 186 U. S. 238; *Chicago, M. & St. P. R. Co.* v. *Min-
nesota,* 134 U. S. 418; *Cincinnati, N. O. & T. P. R. Co.* v.
*Interstate Commerce Commission,* 162 U. S. 184, 196, 197;
Drinker, Interstate Commerce Act, Sec. 240; *Gainesville* v.
*Gainesville Gas & E. P. Co.* 62 So. 919; *Gregg* v. *Laird,* 121
Md. 1; *Grafton* v. *Holt,* 58 W. Va. 182; *Gulf C. & S. F. R Co.*
v. *Hefley,* 158 U. S. 98; *I. C. C.* v. *Louisville & N. R. Co.* 227
U. S. 88; *Joy* v. *St. Louis,* 138 U. S. 1; *Kaul* v. *American In-*

*dependent Tel. Co.* 147 Pac. 1130; *Kinnavey* v. *Terminal R. Asso.* 81 Fed. 802, 803; *Louisville & N. R. R. Co.* v. *Mottley,* 219 U. S. 467; 211 U. S. 149; 133 Ky. 652; *Manitowac* v. *Manitowac & N. T. Co.* 145 Wis. 13; *Manning* v. *Chesapeake & P. Tel. Co.* 32 Wash. L. R. 699; 26 Wash. L. R. 499; 18 App. D. C. 191; *Maryland Tel. & Tel. Co.* v. *Simon's Sons Co.* 103 Md. 136; *Maryland Tel. & Tel. Co.* v. *Simon's Sons Co.* 99 Md. 141; *Murray* v. *New York Teleph. Co.* 143 N. Y. Supp. 534; *Nebraska Tel. Co.* v. *State,* 55 Neb. 627; *Oregon Tel. Co.* 3 Wis. R. C. R. 534, 552; *Oregon R. & Nav. Co.* v. *Fairchild,* 224 U. S. 510; *Rhinelander Power Co.* P.U.R. 1915A, 652; *Robinson* v. *Baltimore & O. R. Co.* 222 U. S. 506, 508; *Rochester Tel. Co.* v. *Ross,* 125 App. Div. 76; *State* v. *Southern Teleph. & Cons. Co.* — Fla. —, 61 So. 506; *Swift* v. *Philadelphia R. Co.* 64 Fed. 59, 69, 70; *Simon's Sons Co.* v. *Maryland Tel. & Tel. Co.* 99 Md. 141; 63 L.R.A. 727; 59 Atl. 193; *Terminal Taxicab Co.* v. *Harding,* 43 App. D. C. 120; *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.* 204 U. S. 426, 449; *Texas & P. R. Co.* v. *Cisco Oil Mill,* 204 U. S. 451; *Water Co.* v. *Hagerstown,* 116 Md. 497; *Williams* v. *Western U. Teleg. Co.* 203 Fed. 140; *Winsor Coal Co.* v. *Chicago & A. R. Co.* 52 Fed. 716, 720–722; *Wisconsin Railroad Comn. Reports,* Vol. 7, p. 465; Vol. 3, p. 534; *Wolverton* v. *Mountain States Teleph. & Teleg. Co.* — Colo. —, 142 Pac. 165.

Mr. *Henry B. F. Macfarland,* Mr. *Edward S. Bailey,* and Mr. *Robert V. Marye,* for the appellee, in their brief cited:

*Appl. National Teleph. & E. Co.* — Ill. —; State Pub. Util. Com., 32 Com. Leaf. 345; *A. T. & S. F. R. Co.* v. *Bell,* 38 L.R.A.(N.S.) 351; *Brick Co.* v. *Troot,* 16 App. D. C. 293; *Chesapeake & P. Tel. Co.* v. *Manning,* 186 U. S. 238; *Express Co.* v. *R. R. Co.* 99 U. S. 191; *Gregg* v. *Laird,* 121 Md. 1; *Gulf Exp. Co.* v. *Harris, Cortner & Co.* 158 Ala. 345; *Home Tel. Co.* v. *Los. Angeles,* 211 U. S. 274; *Knott* v. *Southwestern Tel. & Tel. Co.* Mo. Pub. S. Com., 2 Mo. P. S. C. R. 549; *Louisville*

& N. R. Co. v. Mottley, 219 U. S. 467; *Maryland,* 2 P.'S. C.
Rep. 375; *Prentis* v. *Atlantic Coast Line Co.* 211 U. S. 210;
*St. Louis, A. & T. H. R. Co.* v. *Hill,* 14 Ill. App. 579; *Shoe-
maker* v. *Chesapeake & P. Tel. Co.* 20 I. C. C. R. 614; *Texas
& P. R. Co.* v. *Mugg & Dryden,* 202 U. S. 242; *Wolverton* v.
*Mountain States Tel. Co.* 142 Pac. 165.

Mr. Justice ROBB delivered the opinion of the Court:

Appellant's sole ground for equitable relief is based upon his
contention that under the act of March 4, 1913, his contract
was continued in force. The argument is that the amount
paid under that contract constituted the lowest rate in force
for that class of service when the act was passed. The tele-
phone company answers that the act continued in force *current*
rates only, and not rates no longer open to the public; in other
words, that the contract with the appellant was special and
discriminatory in character and hence expressly prohibited by
said act. The view of the company was adopted by the learned
trial justice.

The above act requires every public utility to file with the
Commission schedules of all rates, tolls, and charges "which it
has established and which are in force at the time." Such
rates, tolls, and charges, unless they contravene some express
statute, are declared to be the lawful rates, tolls, and charges
within the District of Columbia until set aside by the Com-
mission. What was the purpose of this provision? Was it
intended thereby to continue in force the regular schedule of
rates which had been available to all, or was it intended to dis-
continue those rates for the time being, and establish in their
stead rates which for nine years had not been available to the
general public, but which had been enjoyed by a favored few
who constituted a special class? Obviously, both schedules may
not subsist, for it is averred on the one hand and conceded on
the other that the amounts paid under these special contracts
are less than would be the charges under the regular schedules.

Vol. XLV.—10.

As the main purpose of the act was to prevent discrimination, it is apparent that two fundamentally different schedules of charges for the same service may not exist under it.

For nine years prior to the passage of this act new subscribers had been discriminated against, for the only schedule open to them for this class of service was the regular or measured service schedule. That schedule was known to all, but neither the public nor Congress knew whether the telephone company had entered into special contracts. In other words, it was not known whether all were treated alike, so that each should bear his just proportion of the cost of a given service. Was it not, therefore, one great object of Congress in this legislation to turn the light into dark places, to the end that all discrimination might be terminated? Adopting this view, it becomes reasonably certain that Congress intended to continue in force, for the time being, the regular current rates, and not such rates as were special and discriminatory. As was well stated by the Utilities Commission: "While the immediate effect of canceling the unlimited business service in the case of the telephone company may result in increased rates for those who are enjoying this class of service, it does not follow that this condition will continue when rates for telephone service are finally fixed by the Commission." Being of the opinion that, until the Commission does act, the regular schedules are in force, we affirm the decree, with costs.          *Affirmed.*